UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
INFINITY HEADWEAR & APPAREL, LLC, an :
Arkansas limited liability company,                          :
                                       Plaintiff,            :        15-CV-1259 (JPO)
                                                             :
                 -v-                                         :        OPINION AND ORDER
                                                             :
JAY FRANCO & SONS, INC., a New York                          :
corporation and JAY AT PLAY INT'L HK Ltd.,                   :
a Hong Kong limited company,                                 :
                                       Defendants.           :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        Infinity Headwear & Apparel, LLC ("Infinity") filed this action on December 22, 2014,

against Jay Franco & Sons, Inc. and Jay At Play, Int'l HK Ltd (collectively, "Franco"), alleging

that Franco infringes certain claims of U.S. Patent No. 8,864,544 ("the '544 patent"). (Dkt. No.

2.)  Presently before the Court are three matters:  (1) the parties' disputes regarding claim

construction; (2) Franco's request that Infinity's infringement claims be dismissed on the basis of

an *ex parte* reexamination proceeding; and (3) Infinity's motion for leave to amend to assert

additional claims.

        The Court held a *Markman* hearing on December 8, 2015, to determine the proper

construction of the disputed terms in this case, considering only the intrinsic evidence.  (*See* Dkt.

No. 123.)  The Court also held a hearing on June 15, 2016, in which it considered arguments

from counsel on the motion to dismiss and the motion for leave to amend.  (*See* Dkt. No. 170.)

For the reasons that follow, Franco's motion to dismiss is denied, Infinity's motion for leave to

amend is granted, and the disputed claim terms are construed as set forth below.

## I.      Background

The '544 patent, issued on October 21, 2014, is entitled "Hooded Blanket and Stuffed Toy Combination" and is assigned to Infinity.  The invention is directed to "a blanket having a hood comprising an ornamental surface, wherein upon stowing the body of the blanket within an interior volume of the hood, a stuffed toy is provided."  ('544 patent at col. 1 ll. 8–11.)  Figure 1 of the '544 patent provides a "perspective view of a hooded blanket and stuffed toy" and is a "representative embodiment" of the claimed invention:



FIG. 1

(*See id.* at col. 2 ll. 14–15; Figure 1.)  The Abstract of the '544 patent provides a brief description of the invention as follows:

> A hooded blanket and stuffed toy combination device that includes a blanket having a perimeter defining an area, a hood attached to the perimeter and positioned externally to the area, and an ornamental surface comprising an outer surface of the hood, wherein the hood

comprises an outer shell and an interior volume whereby the blanket is stored within the interior volume of the hood to provide a stuffed toy.

('544, Abstract.)  There are 20 claims in the '544 patent.  Infinity seeks damages and a permanent injunction against Franco for infringement of claims 1–2, 6, 8, 10–11, 15–16, and 18–20.

In connection with the pending matters, the Court has considered the following: (1) Infinity's Opening Claim Construction Brief (Dkt. No. 96), Franco's Responsive Claim Construction Brief (Dkt. No. 99), and Infinity's Reply Claim Construction Brief (Dkt. No. 109); (2) Infinity's Motion to Amend/Correct the Scheduling Order and for Leave to Amend the Complaint (Dkt. No. 118), Franco's Opposition (Dkt. No. 137), Infinity's Reply (Dkt. No. 138), Infinity's Supplemental Memorandum in Support (Dkt. No. 163), and Franco's Supplemental Memorandum in Opposition (Dkt. No. 166); and (3) Franco's Letter requesting that this Court dismiss the infringement action (Dkt. No. 140), Infinity's Opposition Brief (Dkt. No. 152), and Franco's Letter Reply (Dkt. No. 153).

## II.     Motion to Dismiss

### A.     Background

The '544 patent is currently undergoing *ex parte* reexamination at the United States Patent and Trademark Office ("PTO") (Control No. 90/013,508).  In relevant part, the PTO has taken the following actions in the course of the *ex parte* reexamination.  On October 21, 2015, the PTO issued a non-final rejection of all twenty claims of the '544 patent as either anticipated under 35 U.S.C. § 102(b) or obvious under 35 U.S.C. § 103(a) in light of certain prior art references.  (*See* Dkt. No. 140-1.)  On December 14, 2015, Infinity responded and amended claims 1–9 and 18–20 and cancelled claims 10–17, adding potential new claims 21–28.  (*Id.*)  On March, 21, 2016, the PTO issued a Final Rejection, finding that the amended claims 1–9 and 18–

28 are improper under 35 U.S.C. § 305 as enlarging the scope of the original claims.  (Dkt. No.

157-1; *see also* 35 U.S.C. § 305 ("No proposed amended or new claim enlarging the scope of a

claim of the patent will be permitted in a reexamination proceeding under this chapter.").)  In

that same action, claims 1–4, 8, and 18–28 were rejected as anticipated under § 102(b) and

claims 5–7 and 9 were rejected as obvious under § 103(a) in light of certain prior art references.

(*See* Dkt. No. 157-1.)  On April 21, 2016, Infinity submitted another set of amendments to the

claims and addressed the Final Office Action from March 21, 2016.  (*See* Dkt. No. 160.)  These

amendments were also rejected in Advisory Actions from May 4, 2016 and June 7, 2016.  (*See*

Dkt. No. 174.)  Finally, on August 22, 2016, Infinity filed its Notice of Appeal with the PTO.

According to the PTO, the average pendency from filing date to the issuance of a

reexamination certificate in an *ex parte* reexamination, as of September 30, 2014, is 22.3 months.

*See* USPTO, Ex Parte Reexamination Filing Data—September 30, 2014, *available at*

http://www.uspto.gov/sites/default/files/documents/ex_parte_historical_stats_roll_up_EOY2014.

pdf.  As the current reexamination was filed on May 15, 2015, it may not be final until mid-

2017—or it may take much longer, in light of the fact that Infinity intends to seek appeal to the

United States Court of Appeals for the Federal Circuit, if necessary.

**B.    Standard**

Although Franco does not specify under which, if any, provision of Rule 12 of the

Federal Rules of Civil Procedure it moves this Court to dismiss Infinity's complaint, it is

axiomatic that, in order to survive a motion to dismiss, a plaintiff must plead sufficient factual

allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must

accept as true all well-pleaded factual allegations in the complaint and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (quoting *Scutti Enters., LLC. v. Park Place Entm't. Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)) (internal quotation mark omitted).

Franco's letter motion to dismiss primarily contends that, because Infinity amended or cancelled its claims during reexamination, the claims no longer exist and, as a result, Franco is not liable for infringing nonexistent claims. (*See* Dkt. No. 140 at 1 ("[I]ndependent claims 1, 10 and 18 that are being asserted by Infinity in this lawsuit NO LONGER EXIST!").)

Franco's argument for relief depends on the doctrine of "absolute" intervening rights, which is premised on the following language from 35 U.S.C. § 252:

> A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

The Federal Circuit has commented on the nature of absolute intervening rights as codified in § 252 as follows:

> The first sentence defines "absolute" intervening rights. This sentence provides an accused infringer with the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent as long as this activity does not infringe a claim of the reissue patent that was in the original patent. This right is absolute. In the words of the statute, "[n]o reissue patent *shall* abridge or affect the right of any person." As long as the use or sale of the accused product does not infringe a claim of the reissue patent that also was in the original patent, the owner of the reissued patent has no recourse under the Patent Act.

*BIC Leisure Prods., Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214, 1220–21 (Fed. Cir. 1993).

Franco's argument is that Infinity's "amendments to independent claims 1 and 18 [give rise to

Franco's] 'absolute intervening rights' which extinguish [Franco's] liability under the original

claims of the '544 patent." (Dkt. No. 40 at 3 (capitalization altered).)  Finally, Franco argues that

any controversy over the '544 patent no longer exists such that jurisdiction is no longer proper.

(*Id.* at 4 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 n.l0 (1974) ("The rule in federal cases is

that an actual controversy must be extant at all stages of review, not merely at the time the

complaint was filed.")).)

### C.    Discussion

Franco's arguments fail to understand the relationship between an action for patent

infringement in federal court and a co-pending administrative proceeding in the form of an *ex

parte* reexamination at the PTO.  "'[R]eexamination[s are] conducted according to the

procedures established for initial examination,' 35 U.S.C. § 305, and, as such, PTO examination

procedures have distinctly different standards, parties, purposes, and outcomes compared to civil

litigation." *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008) (citing *In re Etter*, 756 F.2d

852, 856 (Fed Cir. 1985) (en banc)).  A district court proceeding and a reexamination at the PTO

are separate proceedings with separate standards and purposes.

It is therefore instructive to first understand the regulations promulgated by the PTO that

govern the effect of amendments made to claims during reexamination.  Per 37 C.F.R.

§ 1.530(d), "[a] proposed amendment in an ex parte . . . reexamination proceeding is made by

filing a paper directing that proposed specified changes be made to the patent specification,

including the claims, or to the drawings."  And even though the PTO "will treat proposed

amendments as though they have been entered, *the proposed amendments will not be effective

until the reexamination certificate is issued and published.*"  *Id.* § 1.530(k) (emphasis added).

That is, "[u]ntil a reissue application is granted, the original patent shall remain in effect." *Id.*

§ 1.178.  Amendments made during reexamination, therefore, are not controlling and do not

nullify the effect of the claims of the original patent until *after* the resissue application is granted

and the PTO issues a reexamination certificate.  Franco's argument to the contrary is simply

premature, as the reexamination process remains ongoing.

Indeed, the parties agree that the reissue application is not yet granted and no

reexamination certificate has been issued and published.  (*See* Dkt. No. 152 at 2 (Plaintiff noting

that, "on the basis solely of mere proposed amendments without a final reexamination certificate,

Defendants ask this Court to dispose of this entire case with prejudice."); Dkt. No. 153 at 9

(Defendants writing that "the PTO has yet to issue a Reexamination Certificate confirming the

allowance of any of Infinity's proposed amended claims")).  The proposed amendments to alter

or cancel claims of the '544 patent that are asserted in the present litigation—although submitted

to the PTO by Infinity—are not yet effective.  As a result, Infinity's cause of action concerning

the '544 patent will not be dismissed.

Indeed, Franco cites no case, and this Court knows of none, in which a court has granted

absolute intervening rights before the issuance of a reexamination certificate by the PTO.

*Fresenius USA, Inc. v. Baxter, International, Inc.*, 721 F.3d 1330 (Fed. Cir. 2013), upon which

Franco heavily relied in its briefing and at oral argument, is not to the contrary.  In that case,

"[t]he PTO terminated the reexamination and issued a certificate." *Id.* at 1335.  Only then did

the Federal Circuit conclude that, "when a claim is cancelled, the patentee loses any cause of

action based on that claim, and any pending litigation in which the claims are asserted becomes

moot." *Id.* at 1340; *see also Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 976 (Fed. Cir. 1986)

(holding that where all claims of the reexamined patent are "in the category of a 'proposed

amended or new claim determined to be patentable and incorporated *following a reexamination*

*proceeding*,'" "the patentee has *no* rights to enforce [a non-identical, amended claim] before the date of reissue because the original patent was surrendered and is dead" (quoting 35 U.S.C. § 252) (first emphasis added)); *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 827 (Fed. Cir. 1984) (holding that "[a]n original patent cannot be infringed *once a reissue patent has issued*, for the original patent is surrendered" and "[t]he original claims are dead" (emphasis added)).

Franco, moreover, misses a step in the argument. It would not only need to demonstrate that the reissue is granted and a reexamination certificate is issued, but would further need to demonstrate that the newly amended claims are not identical to the original claims. If "the reexamined or reissued claims are identical to those of the original patent, they shall 'have effect continuously from the date of the original patent.'" *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997) (quoting 35 U.S.C. § 252). That is, even if the reexamination were complete—and it is not—this Court must first determine whether the amended claims are "substantially identical," 35 U.S.C. § 252, to the original claims by "analyz[ing] the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information," *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1363 (Fed. Cir. 1991). There is no *per se* rule that amendments made during reexamination to overcome a prior-art rejection relinquishes claim scope or otherwise warrants absolute intervening rights. *Id.* at 1362 ("We conclude that the proposition of *per se* estoppel, when the issue is substantive change on reexamination, must . . . be rejected."). As such, unless and until the PTO grants the reissue patent and issues a reexamination certificate, and Franco also prevails on a showing that the amended claims are substantively different than the original claims, Franco is not entitled to absolute intervening rights, and a current controversy exists sufficient to maintain this action.

8

### III.      Motion for Leave to Amend

### A.      Background

Infinity moves for leave to amend the complaint to add two causes of action to its pending claim for patent infringement: (1) false advertising under the Lanham Act and/or common law; and (2) false patent marking under 35 U.S.C. §§ 287 & 292, along with associated factual allegations.  (*See* Dkt. Nos. 118, 119.)

In relevant part, Infinity seeks leave to amend its complaint to allege that the patent marking printed on the allegedly infringing products is false.  Franco marks its products with the statement "Worldwide Patent Pending."  (*See* Dkt. Nos. 119-3, 119-4.)  Infinity alleges that, when Franco filed its complaint (*see* Dkt. No. 2), Infinity had no way of verifying or testing the truth of marking as the package is not marked with a corresponding U.S. patent number, application number, or other information.  (Dkt. No. 119 at 4–5.)  It was only through the course of discovery that Infinity was able to uncover sufficient facts to allege the two claims it seeks to add.  This was through both its Requests for Production ("RFP")[1] and through third-party discovery.

The third-party discovery involved Binky & Chee Chee L.L.C., d/b/a/ The Obb, LLC ("Binky & Chee Chee").  That Binky & Chee Chee licenses the products in question to Defendants was known to Infinity by February 13, 2015.  (*See* Dkt. No. 13 at 11–12.)  In the

---

[1]      In the course of discovery, Infinity submitted RFP Number 13, which sought "[a]ll documents and things relating to any intellectual property [Franco] own[s] referring to [Franco's allegedly infringing products], or attempts to acquire intellectual property protection and/or acknowledgement referring to [Franco's allegedly infringing products]."  (Dkt. No. 119-5 at 7.) In response, on May 29, 2015, Franco replied: "None."  (Dkt. No. 119-6 at 9.)  On July 16, 2015, Franco produced a "Provisional Application for Patent" (Dkt. No. 119-10), and an "Electronic Acknowledgement Receipt," dated December 1, 2011, for "Application Number: 61565812" (Dkt. No. 119-11).  Then, on August 5, 2015, Franco supplemented its response to Infinity's RFP No. 13, by responding, "See Document Nos. 252 to 257, which is a copy of the provisional patent application, serial no. 61/565,812 for the J.Animals product."  (Dkt. No. 119-13 at 9.)

course of discovery, Franco responded to Infinity's First Set of Interrogatories on May 29, 2015, noting that it "licenses the accused products from a third party," Binky & Chee Chee. (Dkt. No. 119-7 at 6.) Following a subpoena, on September 8, 2015, Binky & Chee Chee produced a fully executed license between Binky & Chee Chee and Kiddo Toy Group, LLC, as licensors, and Defendant Jay at Play Int'l HK Ltd, as licensee. (Dkt. No. 119-17.) Infinity was able to depose Binky & Chee Chee on October 14, 2015 (Dkt. No. 119-19), and Kiddo Toy Group, LLC on April 4, 2016 (Dkt. No. 163 at 3).

The result of this discovery was confirmation of Infinity's suspicion that there are no pending or granted applications for a patent that could plausibly support the "Worldwide Patent Pending" markings on the allegedly infringing products. In fact, the provisional patent at issue was "abandoned on December 2, 2012." (Dkt. No. 119 at 11.) Infinity alleges that it became aware of the abandoned status of the provisional patent on September 22, 2015, through email correspondence with Franco's counsel. (*See id.*; Dkt. Nos. 119, 118.) This occurred, of course, long after the April 17, 2015, deadline for motions seeking leave to amend the pleadings, pursuant to the Court's Patent Case Scheduling Order. (Dkt. No. 37 ¶ 4.) Infinity's motion for leave to amend was filed on November 6, 2015, almost seven months after the Court's deadline for leave to amend.

### B.       Standard

"The Court should freely give leave [to amend] when justice so requires." Fed. R. Civ. Proc. 15(a)(2). The Supreme Court has noted that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citing 3 Moore, Fed. Practice (1948) §§ 15.08, 15.10)). That said, considerations of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment, futility of amendment, etc." may counsel against granting a motion to amend.  *Id.*

The Court's Patent Case Scheduling Order deadline of April 17, 2015 raises Infinity's burden somewhat.  *See* Fed. R. Civ. P. 6(b)(1)(B); Fed. R. Civ. P. 16(b)(4).  "Where a scheduling order has been entered, the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'"  *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (quoting Fed. R. Civ. P. 15(a), 16(b)).  "A finding of good cause depends on the diligence of the moving party.  *Id.* (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)).

"[T]he good cause standard is not satisfied when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'"  *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 536 (E.D.N.Y. 2010) (citation omitted) (finding that plaintiff acted diligently in seeking leave to amend more than nine months after the deadline had passed but within two months of discovering the relevant facts underlying its new cause of action); *Permatex, Inc. v. Loctite Corp.*, No. 03CV943, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (holding that plaintiff exhibited diligence by moving to amend less than two months after deposition that brought new information to light).  *But see Jackson v. Roslyn Bd. of Educ.*, 596 F. Supp. 2d 581, 586 (E.D.N.Y. 2009) (finding plaintiff's delay of nearly five months to evince "a lack of diligence").

A court "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).  An amendment is prejudicial to the non-moving party if it "would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the

11

resolution of the dispute.'" *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)

(quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

### C.   Discussion

Infinity was sufficiently diligent to meet the "good-cause" standard required to depart

from the Court's scheduling order.

Infinity argues that "the Provisional Application for Patent was never converted into a

utility application, and, therefore, was never published or otherwise publicly available," such that

"even if Defendants had properly marked the packaging of their infringing products with

Application No. 61565812 (which Defendants did not), Infinity still would have been unable

prior to filing suit to retrieve or examine the Provisional Application for Patent." (Dkt. No. 119

at 15 (citations omitted).)  Indeed, Infinity argues that the earliest it could have known about the

allegedly false nature of Franco's marking of its products was September of 2015.  (*Id.* at 16.)  It

was then that Infinity learned that "the Provisional Application for Patent was abandoned on

December 2, 2012, that the License allegedly conveying rights in the Provisional Application for

Patent to Defendants was executed only after the Provisional Application for Patent had already

been abandoned, and that Defendants acknowledge the absence of any intellectual property

rights in their infringing products."  (*Id.*)  Simply put, at the April 17, 2015, deadline set in the

Court's Patent Case Scheduling Order, Infinity did not have access to the factual underpinnings

necessary to allege the two causes of action related to the allegedly false marking.  *See*

*Enzymotec*, 754 F. Supp. 2d at 537 ("[C]auses of action in a complaint must be based on factual

allegation, not factual speculation.").  And Infinity's actions during the almost seven months

following that deadline evince a diligence to confirm its suspicions and act with all due haste to

file the present motion for leave to amend.

12

Franco's conclusory allegation that "evidence of [Franco's] patent rights . . . was publically available to [Infinity] before [Infinity] filed the complaint in Dec[ember] 2014" is insufficient.  (Dkt. No. 137 at 4.)  Franco fails to explain which public database ostensibly contains the relevant information or how Infinity could have otherwise learned that information.  (*See* Dkt. No. 119 (citing Dkt. No. 119-18).)  Franco, moreover, does not allege "bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party by virtue of allowance of the amendment."  *Foman*, 371 U.S. at 182.

Franco further contends that the newly added claims are futile because they cannot withstand a motion to dismiss.  (*See* Dkt. No. 137 at 5–24.)  Franco alleges five theories of futility:  (1) the Court does not have subject matter jurisdiction over the additional claims (Dkt. No. 137 at 6–8); (2) the "Worldwide Patent Pending" notice was not an "advertisement" or a "promotion" within the meaning of the relevant statute (*id.* at 11–13); (3) Infinity failed to plead "intent to deceive" and "bad faith" (*id.* at 14–15, 19); (4) Infinity failed to plead the "who, what, when, where, and how" standard of Rule 9(b) (*id.* at 15–19); and (5) Infinity did not suffer a "competitive injury" that caused it "direct harm" under the relevant statute (*id.* at 20–24).  Because these arguments are addressed through the lens of a 12(b)(6) motion to dismiss, the Court must "accept[] the allegations in [Infinity's] initial and proposed amended complaints as true, and draw[] all inferences in [Infinity's] favor."  *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002).  Each of Franco's arguments is addressed below.

First, this Court has subject matter jurisdiction over the false marking and false advertising claims that Infinity seeks to add to its complaint.  Franco argues that 35 U.S.C. § 292(c)—which states that "[t]he marking of a product . . . with matter relating to a patent that

covered that product but has expired is not a violation of this section"—strips this Court of jurisdiction by "eliminat[ing] Infinity's proposed false marking claims." (Dkt. No. 137 at 7.) Franco may argue that its conduct falls within the safe harbor of § 292(c), but that argument does not strip this Court of jurisdiction over the controversy; rather, it introduces a potential factual dispute regarding Infinity's allegations of false marking and false advertising that does not bear on the whether this Court should grant Infinity's motion for leave to amend. (*See* Dkt. No. 138 at 10–11.)

Second, whether the phrase "Worldwide Patent Pending" was an "advertisement" or a "promotion" within the meaning of 35 U.S.C. § 292 and the Lanham Act, respectively, is a factual determination that cannot be resolved on the pleadings. As it stands, Infinity's complaint does allege that Infinity and Franco "directly compete in the marketplace," that Franco marked its product packaging with a "false and/or misleading" statement, that such statement was made in bad faith as Franco never had a good faith basis upon which to believe the statement was true, and that Infinity has been damaged by such statements. (*See* Dkt. No. 138 at 9–10 (citing Dkt. No. 119-2 ¶¶ 32–45).) That the "Worldwide Patent Pending" language is in small font or appears at the bottom of the product boxes (*see* Dkt. No. 137 at 13) does not demonstrate that the complained-of language is not an "advertisement" or "promotion."

Third, Infinity specifically alleges that Franco falsely marked its products "with the phrase 'Worldwide patent pending,'" and that such marking was done "for the purpose of deceiving the public." (*See* Dkt. No. 119-2 ¶¶ 19–31.) Under the motion to dismiss standard, this is sufficient to demonstrate an allegation of "intent to deceive" or "bad faith."

Fourth, Infinity pleads the "who, what, when, where, and how" standard of Rule 9(b), to the extent that it applies. (*See* Dkt. No. 138 at 11.) As Infinity states: "Who: Defendants; what: false statements of knowingly non-existent patent rights; when: from the outset of Defendants'

14

licensed product sales; where: in interstate commerce as contained on advertising and promotional materials directed at distributors and consumers; how: on product packaging and other promotional materials directed at distributors and consumers." (*Id.* (citing Dkt. No. 119-2 ¶¶ 19–45).)

Fifth, Infinity specifically alleges in its proposed amended complaint that it suffered a "competitive injury" that caused it "direct harm." Infinity alleges that Franco's conduct has "caused a competitive injury to Infinity," and that, as a result, "Infinity has been irreparably damaged." (Dkt. No. 119-2 ¶ 30–31.)

In sum, Infinity satisfies the standards of Rule 16(b)—and by extension the laxer standard of Rule 15(a)—in its motion for leave to amend the complaint. Franco does not meaningfully dispute Infinity's arguments and fails, moreover, to demonstrate the futility of allowing Infinity leave to amend its complaint to add false advertising under the Lanham Act and/or common law and false patent marking under 35 U.S.C. §§ 287 & 292.

## IV.    Claim Construction

The Court held a *Markman* hearing on December 8, 2015, to determine the proper construction of the disputed terms in this case, considering only the intrinsic evidence. The Court lays out its constructions of the disputed terms in the sections that follow.

### A.    Standard

This Court's claim construction analysis is substantially guided by the Federal Circuit's decisions in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc). Claim construction is an issue of law properly decided by the Court. *Markman*, 52 F.3d at 970–71. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure*

*Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "[I]n all aspects of claim construction, 'the name of the game is the claim.'"  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)).

To determine the meaning of the claims, courts start by considering the intrinsic evidence, the primary source for determining claim meaning.  *Phillips*, 415 F.3d at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004) (collecting cases).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  The general rule—subject to certain specific exceptions discussed herein—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent and intrinsic evidence.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).  "There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time."  *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (vacated on other grounds).

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2]  *Golden Bridge Tech., Inc. v. Apple Inc.*, 758

---

[2]     The Court notes that some cases have characterized other principles of claim construction as exceptions to the general rule as well.  *See, e.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (noting, for example, the statutory requirement that "a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format").

F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309. The standard for lexicography is particularly relevant for the present case.

It is well settled that "patentees may choose their own descriptive terms as long as those terms adequately divulge a reasonably clear meaning to one of skill in the art." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999). To act as his or her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365). Departing from the ordinary meaning of the claim terms requires the patentee to set forth his or her lexicography "with reasonable clarity, deliberateness, and precision." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998); *see also In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) ("Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision."). "'Where an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure' so as to give one of ordinary skill in the art notice of the change." *In re Paulsen*, 30 F.3d at 1480 (quoting *Intellicall, Inc., v. Phonometrics, Inc.*, 952 F.2d 1384, 1387–88 (Fed. Cir. 1992). "Absent implied or explicit lexicography," the plain meaning of the claim terms governs. *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 n.1 (Fed. Cir. 2016).

The Federal Circuit, in *Phillips*, rejected any claim construction approach that sacrificed the intrinsic record—including the specification—in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The en banc court disparaged the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before turning to the specification.  *Phillips*, 415 F.3d at 1319–24.  *Phillips* does not, however, preclude all uses of dictionaries in claim construction proceedings.  Instead, the court assigned dictionaries a role subordinate to that of the intrinsic record.  The Federal Circuit noted that, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful."  *Id.* at 1314 (citation omitted).

The Federal Circuit did not impose any particular sequence of steps for a district court to follow when it considers disputed claim language.  *Id.* at 1323–25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

### B.    Claim Terms

#### 1.  Blanket

| Infinity's Proposed Construction | Franco's Proposed Construction |
| --- | --- |
| A blanket, a comforter, a sheet, a jacket, a windbreaker, a parka, a poncho, a towel, a beach towel, a bath towel, a coat, a wrap, a scarf, a shawl, a cloak, a shirt, a sweatshirt, a hooded shirt, a hooded sweatshirt, or similar piece of clothing | Plain and ordinary meaning, *i.e.*, a flat geometric shaped piece of fabric having edges with corners wherein the edges extend along the perimeter to define the area. |

The term "blanket" appears in claims 1–15 and 17–20 of the '544 patent.  Infinity's proposed construction is based on the specification's definition of the term blanket, as follows:

> As used herein, the term "blanket" may include a blanket, a comforter, a sheet, a jacket, a windbreaker, a parka, a poncho, a towel, a beach towel, a bath towel, a coat, a wrap, a scarf, a shawl, a cloak, a shirt, a sweatshirt, a hooded shirt and/or a hooded sweatshirt. In general, one having skill in the art will appreciate that the teachings of the present invention may be applied to any piece of clothing or other material compatible with the underlying methodologies and principles disclosed herein.

'544 patent col. 2 l. 62–col. 3 l. 3.  The Court concludes that this is an explicit definition of the term "blanket" contained in the specification that meets the "exacting" standard for finding lexicography.  *GE Lighting Solutions*, 750 F.3d at 1309.  The phrase "[a]s used herein," as well as setting off the term-at-issue in quotation marks, clearly indicates an intent by the drafter to provide a particular definition of the term "blanket" that is contrary to its plain and ordinary meaning.  *See Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210–11 (Fed. Cir. 2007) (explaining that a patentee may expressly define certain claims' terms through the use of phrases like "as used herein").  The patentee has "clearly set forth a definition of the disputed claim term," and "clearly express[ed] an intent to define the term."  *Thorner*, 669 F.3d ta 1365.  As the specification of the '544 Patent expressly defines the term "blanket," the definition provided therein is "dispositive."  *Phillips*, 415 F.3d at 1316.

Franco's proposed construction, or some version of it, would be favored if the specification did not provide such an unmistakably clear intent of the patentee to stray from the plain and ordinary meaning of the term via lexicography.  *See GE Lighting Solutions*, 750 F.3d at 1309.  Thus, Franco's argument that "Infinity cannot rebut the 'heavy presumption' that the claim term 'blanket' carries its 'ordinary and customary meaning'" is unavailing.  The

presumption is rebutted here by the specification's clear and unmistakable definition of the term-at-issue.

Franco's emphasis on instances of the use of "blanket" in the specification—other than the explicit lexicographic instance—does not justify a deviation from the patentee's clear intent to serve as his own lexicographer with respect to that term.  (*See* Dkt. No. 99 at 5–7.)  *See also Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005) (noting that all a patentee must do to be his own lexicographer is "clearly express that intent in the written description" so as "to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term").

Franco further argues that the claims of the patent are inconsistent with the explicit definition provided in the specification.  (Dkt. No. 99 at 7–9.)  In particular, Franco argues that the definition of "blanket" given in the specification is "inconsistent with the structural requirements of the claim language."  (*Id.* at 9.)  But there is no inconsistency with construing "blanket," as defined in the specification, and also requiring that any "blanket" covered by the claims have a "perimeter," an "area," an "edge," a "corner," etc., sufficient to satisfy the structural requirements of the claims.  Each of these claim terms represents a separate limitation imposed by the claims and this Court sees no reason to construe the term "blanket" as limited by other, independent claim terms.

Franco also argues that during the prosecution of the '544 patent, "Infinity NEVER amended the claims to cover any type of garment or clothing and NEVER argued to the PTO that the claimed 'blanket' was distinguishable over the prior art because its 'blanket' *also* covers a garment or clothing."  (Dkt. No. 99 at 11.)  But this is not the test for the determination of claim scope when there exists an explicit definition of the term in the specification.  Franco cites no authority for the proposition that a patentee must seek to amend its claims to match the scope of

the explicit definition given to its terms in the specification.  Nor is it dispositive of claim scope that "each of the . . . prior art references chosen and cited by the Examiner to reject the claim of the '544 patent [during prosecution] *only* discloses a blanket."  (*Id.* at 12.)  Franco does not rebut the principle of claim construction that "[t]he claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose," *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001), so its arguments do not prevail.

The dictionary definitions upon which Franco relies cannot overcome the clear language of the specification.  "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  *Phillips*, 415 F.3d at 1321.  Franco's remaining arguments—that "blanket" cannot define "blanket" (Dkt. No. 99 at 20); that the definition provided in the specification is a mere list of examples (*id.* at 20–22); and that a "hooded sweatshirt" cannot have a second "hood" attached (*id.* at 22–24)—are each insufficient to overcome the clear and unmistakable definition of the term "blanket" in the specification of the '544 patent.

The Court construes the term "blanket" to mean "a blanket, a comforter, a sheet, a jacket, a windbreaker, a parka, a poncho, a towel, a beach towel, a bath towel, a coat, a wrap, a scarf, a shawl, a cloak, a shirt, a sweatshirt, a hooded shirt, a hooded sweatshirt, or similar piece of clothing."

## 2.   Perimeter and Perimeter Edge

| Infinity's Proposed Construction | Franco's Proposed Construction |
|---|---|
| The outer limits of an area | Plain and ordinary meaning, *i.e.*, the outside edge of the area of the flat surface of the blanket. |

The term "perimeter" appears in asserted claims 1, 10, and 18 of the '544 patent.  The parties agree that neither the specification nor the claims provide an explicit definition of the term "perimeter."  (*See* Dkt. No. 96 at 9; Dkt. No. 99 at 24.)  The parties also agree that the Court can rely on dictionary definitions and that the terms "perimeter" and "perimeter edge" should be construed similarly.  (*See* Dkt. No. 96 at 15; Dkt. No. 99 at 24.)

Franco's proposed construction essentially contains Infinity's proposed construction: Infinity's "the outer limits of an area" is indistinguishable conceptually from Franco's "the outside edge of the area."  Franco seeks to add to that construction the phrase: "of the flat surface on the blanket."  Infinity, in contrast, argues that this addition is "cumbersome and confusing, unnecessarily enlarging the straightforward and easily understood word 'perimeter.'"  (Dkt. No. 96 at 10.)  And while Franco cites the specification as support for its additional language, the term "flat surface" appears nowhere in the patent.  Franco, for its part, argues that Infinity's proposed construction "is overbroad since it fails to define these terms within the context of the intrinsic evidence, and is not supported by any evidence of one of ordinary skill."  (Dkt. No. 99 at 25–26.)

The Court concludes that the term "perimeter" is used consistently in the claims and is unambiguous.  It is easily understandable by a jury and should be given its plain and ordinary meaning.  "Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."  *CCS Fitness*, 288 F.3d at 1366.  For this term, "the ordinary

meaning . . . as understood by a person of skill in the art [is] readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  In this case, therefore, "general purpose dictionaries may be helpful."  *Id.*; *see also Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) ("[J]udges are free to rely on dictionaries at any time during the process of construing claims 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'").

The dictionary definitions provided by the parties are substantially similar.  (*Compare* Dkt. No. 96 at 10 ("the outer limits of an area") (quoting The Am. Heritage Dictionary of the English Language, 1310 (5th Ed. 2011) (definition 2), *with* Dkt. No. 99 at 25 ("the outside edge of an area or surface") (quoting Meriam-Webster online).)  Franco's proposed construction, however, unreasonably imports two other disputed claim terms—"edge" and "blanket"—and appears to be an attempt to distinguish "flat, geometric shaped blankets" from "clothing or garments," an argument it makes for its proposed construction of the term "blanket."  (*See* Dkt. No. 99 at 25.)

The Court construes the terms "perimeter" and "perimeter edge" to mean "the outer limits of an area."

### 3.  Positioned Externally

| Infinity's Proposed Construction | Franco's Proposed Construction |
|---|---|
| Relating to, existing on, or connected with the outside or an outer part | Positioned outside or beyond an area defined by the perimeter of the blanket. |

The term "positioned externally" appears in asserted claims 1, 10, and 18 of the '544 patent.  The parties again agree that the term is not expressly defined in the '544 patent.  (*See* Dkt. No. 96 at 11; Dkt. No. 99 at 26.)

23

For the reasons stated above in the discussion of the terms "perimeter" and "perimeter edge," "general purpose dictionaries may be helpful." *Phillips*, 415 F.3d at 1314. Infinity relies on the definition of the term "external" for its proposed construction. (*See* Dkt. No. 96 at 11 (quoting The Am. Heritage Dictionary, 627 (definition 1)).) Franco does not provide an explanation for the origin of the language of its proposed construction, and instead implies that its construction is correct by reference to the prosecution history. (*See* Dkt. No. 99 at 26–27.) Franco's proposed construction would not only add language without support in any intrinsic or extrinsic evidence—"outside or beyond"—but it would also expand "positioned externally" to include claim terms that are themselves in need of construction—"area," "perimeter," and "blanket." Furthermore, as Infinity argues, the phrase "outside or beyond" would exclude preferred embodiments as the "hood" could not be attached to the "blanket" if it is "beyond" the perimeter of the blanket. (*See* Dkt. No. 96 at 11; Dkt. No. 109 at 18–19.)

The Court construes the term "positioned externally" to mean "relating to, existing on, or connected with the outside or an outer part."

### 4. Continuous Edge Surface

| Infinity's Proposed Construction | Franco's Proposed Construction |
| --- | --- |
| An uninterrupted border | The entire edge of the hood, including a detached edge that defines the opening of the hood and an attached edge coupled to the perimeter of the blanket. |

The term "continuous edge surface" appears in asserted claims 1, 10, and 18 of the '544 patent.

For the reasons stated in the discussion above regarding the claim terms, "general purpose dictionaries may be helpful" to construing "continuous edge surface." *Phillips*, 415 F.3d at 1314. Infinity relies on the definition of the words "continual" and "edge" for its proposed

construction.  (*See* Dkt. No. 96 at 12 (citing The Am. Heritage Dictionary, 397 & 568).)  Infinity

argues that Franco's proposed construction "is both unnecessary and—if substituted into the

claim in the place of 'continuous edge surface'—will result [in] a confusing repetition of the

same limitations.  (*See id.*)  This Court agrees.

The Court construes the term "continuous edge surface" to mean "an uninterrupted

border."

### 5.  Fastener

| Infinity's Proposed Construction | Franco's Proposed Construction |
|---|---|
| A button and loop closure, a button and buttonhole closure, a hook and loop closure, a strap closure, a tie closure, a zipper closure, a snap closure, combinations of the foregoing closures, or any means whereby to retain an item | Plain and ordinary meaning, *i.e.*, a device for connecting or joining the ends of two members together. |

The term "fastener" appears in asserted claims 1, 18, and 19 of the '544 patent.  Infinity's

proposed construction is, like the term "blanket," based on an argument that the patentee acted as

its own lexicographer in defining the term.  Specifically, Infinity relies on the following

disclosure in the patent's specification:

> Referring now to FIG. 6, fastener 50 may include any means whereby to retain blanket 12 within internal volume 46.  For example, in some embodiments fastener 50 is comprises at least one of a button and loop closure, a button and buttonhole closure, a hook and loop closure, a strap closure, a tie closure, a zipper closure, a snap closure, and combinations thereof. In some embodiments an enclosure 50 is selected that is easily accessible and set by a child.

'544 patent col. 4 ll. 60–67.  This, according to Infinity, is a "special definition given [in the

patent specification] to [the] claim term ["fastener"] by the patentee," such that "the specification

[of the '544 Patent] acts as a dictionary."  (Dkt. No. 96 at 13 (quoting *Phillips*, 415 F.3d at 1316,

1321).)

Franco disagrees that this passage constitutes a definition that trumps the plain and ordinary meaning of the term through lexicography. Franco argues that "the phrases: '[f]or example, in some embodiments,' and 'comprises at least one of,' are NOT sufficiently clear, deliberate, and precise words from which one of ordinary skill in the art would understand that Infinity intended to specially define the term 'fastener.'" (Dkt. No. 99 at 30.) This Court agrees. The relied-upon passage provides a list of examples that "does not . . . unambiguously signify that the description provided is definitional." *Abbott Labs*, 473 F.3d at 1210 (Fed. Cir. 2007).

Instead, the Court concludes that, for the reasons stated in the discussion regarding the claim terms above, "general purpose dictionaries may be helpful" to construing "fastener." *Phillips*, 415 F.3d at 1314. The dictionary definition favored by Franco is "a hardware device that mechanically joins or affixes two or more objects together" (Dkt. No. 99 at 29), while that favored by Infinity is "[a] device, such as a clip, pin, or clasp, that attaches something firmly to something else," or "[a] device, such as a seatbelt, that secures a person or object" (Dkt. No. 96 at 13). Each of the definitions provided is more consistent with Franco's proposed construction than Infinity's.

Franco, moreover, argues that its construction is preferable under the doctrine of claim differentiation. While "the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). In this case, claim 19 of the '544 patent recites "a button and loop closure, a hook and loop closure, a strap closure, a tie closure, a zipper closure, and a snap closure." Franco argues, therefore, that "Infinity's proposed claim construction impermissibly reads into independent Claim 18 limitations that are explicitly present in dependent Claim 19," thereby "render[ing] superfluous the language in Claim 19." (Dkt. No. 99 at 29–30.) Infinity disagrees, noting that its proposed

construction is broader than the list of fasteners given in Claim 19, such that "claim 19 further limits the universe of available fastening means."  (Dkt. No. 109 at 15.)  While Infinity is correct that the doctrine of claim differentiation does not compel Franco's proposed construction (claims 18 and 19 retain separate scope even under Infinity's proposed construction), the Court nevertheless adopts Franco's proposal as the Court finds that the patentee did not intend to act as his own lexicographer and because Franco's construction better reflects the plain and ordinary meaning of the term "fastener."

The Court construes the term "fastener" to mean "a device for connecting or joining the ends of two members together."

### 6.  Body

| Infinity's Proposed Construction | Franco's Proposed Construction |
| --- | --- |
| The main, principal, or central part | Plain and ordinary meaning, *i.e.*, the flat surface of the blanket defined by the perimeter of the blanket that forms a geometric shape. |

The claim term "body" appears in asserted claim 18.  Infinity argues that its definition is consistent with the dictionary definition of the term "body."  (*See* Dkt. No. 96 at 14–15 (citing The Am. Heritage Dictionary, 204 (definition 5 ("The main or central part")))).)  It also faults Franco's construction as containing "technical jargon, such as 'geometric shape' which will be unhelpful to the jury," and for including other claim terms—"blanket" and "perimeter"—which themselves require definition.  (*Id.* at 15.)  This Court finds that Infinity's proposed construction is consistent with the plain and ordinary meaning of the word "body."

The Court construes the term "body" to mean "the main, principal, or central part."

### 7.  Area

| Infinity's Proposed Construction | Franco's Proposed Construction |
|---|---|
| No proposed construction; plain and ordinary meaning | Plain and ordinary meaning, *i.e.*, the flat surface of the blanket defined by the perimeter of the blanket. |

The claim term "area" appears in asserted claims 1, 10, and 18.  Infinity argues that "[t]he term 'area' is well within the common vocabulary of lay members of the jury" and believes no construction is necessary.  (Dkt. No. 96 at 16.)  It further criticizes Franco's proposed construction as "convoluted and clumsy," arguing that it "is also circular in that it construes one disputed term—area—by using 'blanket' and 'perimeter,' both of which are also disputed terms."  (*Id.*)  This Court agrees that the term requires no construction.

The Court construes the term "area" to have its plain and ordinary meaning.

### 8.  Corner

| Infinity's Proposed Construction | Franco's Proposed Construction |
|---|---|
| The position at which two lines, surfaces, or edges meet | Plain and ordinary meaning, *i.e.*, the part of the geometric shaped blanket where two edges meet. |

The claim term "corner" appears in asserted claim 18.  For the reasons stated in the discussion regarding the claim terms above, "general purpose dictionaries may be helpful" to construing "corner."  *Phillips*, 415 F.3d at 1314.  Infinity relies on the definition of corner as "[t]he position at which two lines, surfaces, or edges meet and form an angle."  (Dkt. No. 96 at 17 (citing The Am. Heritage Dictionary, 408 (definition 1a)).)  Infinity argues that Franco's proposal is "flawed inasmuch as it seek[s] to limit the term under construction to a single embodiment and circularly defines one term by reliance on other claim terms, including 'blanket.'"  (*Id.*)  The Court agrees.

The Court construes the term "corner" to mean "the position at which two lines, surfaces, or edges meet."

**V.     Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is DENIED; Plaintiff's motion for leave to amend is GRANTED; and the Court adopts the constructions set forth in this opinion for the disputed terms of the '544 patent.

The proposed amended complaint at Docket Number 119-2 is hereby deemed the operative complaint in this action.

The Clerk of Court is directed to close the motions at Docket Numbers 96 and 118.

SO ORDERED.

Dated:  September 26, 2016
        New York, New York

_____
           J. PAUL OETKEN
        United States District Judge